Young and others *vs.* Beardsley, Agent of the Auburn State
Prison.

The act of 1842, in relation to the employment of convicts in the state prisons, did
not authorize the agents of the state to annul contracts previously entered into,
in conformity to the law as it then existed, without the consent of the other par-
ties to such contracts.

It is not competent for the legislature, by a retroactive statute, to make the opinion
of the attorney general, that a contract between the state and an individual in re-
lation to convict labor was illegal, conclusive evidence of such illegality as against
the latter.

But if the contract was in fact illegal, or if it was originally valid, the contractors
had violated it, so as to authorize the state to rescind it, but the inspectors of the
prison were, under the act of 1842, bound to act upon the opinion of the attorney
general, and to rescind the contract.

Where valuable services have been performed by one party for another under a con-
tract originally illegal and unauthorized, and the party who has received the
benefit of such services afterwards gives a judgment to the other party to secure
the payment of the amount equitably due therefor, the court of chancery will
not interfere to relieve the defendant in the judgment from the payment of the
same, although the adverse party might not have been able to recover upon the
original contract, on account of its illegality.

This was an application for an injunction to restrain the defen-
dant from collecting a judgment given for state prison labor, and
to restrain the collection of certain notes given as collateral secu-
rity for the same debt, and also to restrain a suit against the com-
plainants and their sureties for other labor performed under a con-
tract made by them with a former agent of the prison. On the 1st
of September, 1839, a contract was made between the agent of the
prison, of the one part, and the complainants J. Young and A. D.
McMaster, as principals, and W. Taber and H. Young as their sure-
ties, of the other part, for the labor and services of *not less than
thirty-five,* nor more than forty, convicts, suitable to be employed
at plane and tool making, for the term of five years from that date.
And the contractors were to pay for the services of each convict
thirty-seven and a half cents per day, payable monthly, the pay-
ments to commence on the expiraton of three months' credit given

on the amount of the first month's earnings. Under this contract the contractors commenced the employment of the convicts in the plane and tool making business, which was the making of articles of which the chief supply for the consumption of this country was not obtained by foreign importations, but by domestic manufacture. And the employment of the convicts was continued under the contract, until the first day of May, 1843, when the contract was rescinded without the consent of the contractors; the attorney general having, previous to that time, certified to the inspectors of the prison that the contract was, in his opinion, illegal and in violation of the laws of the state. The contractors continued to pay for the labor of the convicts until their contract was submitted to the attorney general pursuant to the directions of the act of April, 1842, in relation to convict labor in the state prisons; after which time they refused to pay although they continued to employ the convicts. On the 21st of February, 1843, there was due to the agent of the prison, for the labor of convicts, which had been performed in 1842, and on which the three months' credit had expired, the sum of $3521,84. For this amount the contractors gave a judgment to the agent of the prison. They also executed their five promissory notes therefor, payable to the order of W. Taber, one of their sureties in the contract; which were endorsed by him to the agent. These notes were made payable at different periods, and were afterwards protested for non-payment. And only $500 was paid upon such notes and judgment. Subsequent to the giving of these notes and the judgment, other sums became due and payable for labor, on which the three months' credit elapsed, on the last days of February, March, and April, 1843; and which sums were not paid when they became due according to the terms of the contract, and still remained unpaid. In February, 1844, the agent caused an execution to be issued upon the judgment, to collect the balance due thereon. He also brought a suit upon the notes against the endorser, and another suit against the contractors and their sureties, to recover for the services of the convicts not included in the notes and judgment.

*W. H. Seward*, for the complainants.

*Julius Rhoades*, for the defendant.

THE CHANCELLOR. I see no reason to change the opinion heretofore expressed, that this is not a proper case to dispense with the payment of the amount of the judgment into court as a condition of the granting of an injunction; even if there was sufficient equity in the bill to entitle the defendants in the judgment to an injunction. There certainly was no fraud on the part of the former agent in obtaining the judgment. For the facts upon which the question of the legality of the contract depended were as well known to the contractors as to him. And he told them truly, that if they did not pay or secure to his satisfaction the amount then due, he would have the right to rescind the contract for a noncompliance with its terms on their part; even if it was legal. Having themselves violated the contract, and having given these securities for the labor which had been actually performed, to enable them to retain the benefit of the contract for the time which was yet to elapse if it should eventually be decided that the contract was legal and valid, they have no ground whatever which can justify a court of equity in setting aside those securities even if the contract was in fact illegal. For if the parties have, from a mistake of the law or the facts of the case, made an illegal contract, upon which neither of them could have sustained a suit, a subsequent agreement to pay for the services of the convicts which had been actually performed, may still be a legal and equitable agreement.

So far as the bill seeks to restrain the suit upon the contract to recover for services of the convicts subsequent to the judgment, the complainants' remedy, if any, is at law, if the contract is illegal. And if it is not illegal, they have no defence any where; for the contractors had themselves violated the contract, by neglecting to pay for the services of the convicts the amounts which became due from time to time, subsequent to the giving of the judgment. That of itself was a sufficient ground for rescinding the contract, even if the certificate of the attorney general did not authorize

Young *v.* Beardsley.

the inspectors to terminate it on the ground of its illegality. And the contractors having violated the contract on their part, by neglecting to pay for the convict labor already performed, according to its terms, they have no legal or equitable claim for damages for not being permitted to have the labor of the convicts subsequently. In this view of the case, it is perhaps unnecessary that I should express any opinion upon the construction of the act of May, 1835, in relation to the state prisons, in reference to the legality of this contract. But as that question was fully argued by the counsel, and it may save further litigation in this court, it may not be improper to express my views upon that subject.

The legislature appears to have had two objects in view, in the adoption of the 7th, 8th and 9th sections of the act of May, 1835 ; *First*, to prevent the employment of convicts in those trades in which the mechanics of this country were engaged, except so far as the convicts had already been instructed in such trades; and *Secondly*, to regulate the making of contracts so as to produce a fair competition. The 7th and 8th sections are confined to the first object exclusively ; but the 9th section appears to have been intended to embrace both. The 7th section accordingly provided that no mechanical trade should thereafter be taught to convicts, except the making of those articles of which the chief supply for the consumption of the country was imported from foreign countries. And the 8th section authorized the inspectors to employ artizans from abroad to instruct the convicts in new trades not pursued in this state. The 9th section, after requiring the consent of the inspectors to contracts for the services of convicts for a longer period than six months, directs two months' notice of the time and place for letting such contracts ; which notice is to specify the particular branches of business in which the convicts are to be employed, the length of time, not exceeding five years, for which their services are to be let, and the number of convicts to which the contractors are to be limited : that is, as I understand the language of this section, the greatest number to whose services the contractor shall be entitled under his contract, at any time

during its continuance. The last clause of this 9th section then provides that in all those branches of business by which the consumption of the country is chiefly supplied without foreign importation, the number of convicts to be employed or let shall be *limited* by the number of convicts who had learned a trade before coming to prison.

The limitation in this last clause of the 9th section was intended to refer to a limitation to be inserted in the contract. And it cannot be presumed that it was intended to apply to the number of convicts at the time of making the contract, who had learned the trade before coming to prison. For as the contract might continue five years, there could be no certainty that the number who had previously learned the trade would remain the same, or as large as it then was, during the five years. And as new convicts could not be instructed in such trade, if the contract was not limited so as not to exceed the number in prison from time to time, who had learned the trade before coming there, it would be impossible for the agent to fulfil the contract without violating the law; in case the number of convicts who had learned the particular trade should be reduced, by the expiration of sentences, or otherwise. Although the indefinite article is used in the last clause of this 9th section, it is obvious that the legislature must have intended that the contract for the services of convicts employed in domestic manufactures, should be limited by the number who had learned the particular trade to which such contract related, and not by the number who had learned any trade whatever previous to their imprisonment.

In this contract there is an absolute agreement, by the agent, for the services of not less than thirty-five convicts to be employed in a branch of business of which the chief supply of the country was from home manufactures; and without making any limitation or provision for the employment of a less number, if there should not be a sufficient number in prison from time to time, who had learned the trade of plane and tool making, to amount to the minimum of thirty-five specified in such contract. The act of 1842, could not render this contract illegal, if it was

a substantial compliance with the law as the same existed when such contract was made. Nor does that act authorize the violation of any contract previously made. For the 4th section, in terms, declared that nothing in that act contained should prevent the employment of convicts at any mechanical trade, in the state prisons, so far as might be necessary to fulfil the obligations of the state in such existing contracts as had been lawfully made for convict labor. Nor was it competent for the legislature to make the opinion of the attorney general, that contracts previously made were illegal, conclusive against the contractors. But if the contract was in fact illegal, and that was also the opinion of the attorney general, the inspectors were bound to rescind the contract. And especially were they bound to act upon the opinion of the attorney general that the contract was illegal, and to rescind it, whatever might be their own opinions upon the subject, if, as in this case, the contractors themselves had violated the contract by neglecting to comply with its terms on their part; so as to authorize the agent and inspectors to rescind it without reference to its illegality.

From the facts of the case, as they now appear, the complainants do not seem to have any equitable claim to damages for a breach of the contract on the part of the officers of the prison, whether it was or was not a valid contract in its inception, after having neglected to comply with the contract by paying for the labor which had been performed for more than three months previous to the 1st of May, 1843. The taking of the notes and judgment, and the extension of the credit for the amount liquidated in February of that year, was probably a waiver, by the agent, of the violation of the contract by the contractors previous to that time. But there is nothing in the case to show that the agent, or the inspectors of the prison, ever agreed to extend the time of the payments which subsequently fell due on the last days of February, March and April.

The application for an injunction must therefore be denied, with costs.